UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| NIDA A., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:21-cv-569-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM |
| | § | DECISION AND ORDER |
| Defendant. | § | |

## <u>INTRODUCTION</u>

Plaintiff Nida A. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied her application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 11).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 8, 9. Plaintiff also filed a reply brief. *See* ECF No. 10. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 8) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 9) is **GRANTED**.

## <u>BACKGROUND</u>

Plaintiff protectively filed an application for SSI on December 6, 2017, alleging disability beginning December 5, 2016 (the disability onset date), primarily due to lupus and fibromyalgia. Transcript ("Tr.") 17, 46, 203-08. 223. Plaintiff's claim was denied initially on February 8, 2018, after which she requested an administrative hearing. Tr. 17. On October 3, 2019, Administrative Law Judge Melissa Jones ("ALJ Jones") convened a hearing in Buffalo, New York, at which

Plaintiff appeared and testified and was represented by Elias Farah, an attorney. Tr. 76. Because ALJ Jones had tendered her resignation to the Agency, the hearing was postponed. Tr. 78-79. Thereafter, on January 17, 2020, Administrative Law Judge Paul Goerger ("the ALJ") held another hearing in Buffalo, New York, at which Plaintiff appeared and testified and was represented by Kenneth Hiller, and attorney. Tr. 17. Andrew Pasternak, an impartial vocational expert, also appeared and testified at the hearing. *Id*.

The ALJ issued an unfavorable decision on April 29, 2020, finding that Plaintiff was not disabled. Tr. 17-31. On March 23, 2021, the Appeals Council denied Plaintiff's request for further review. Tr. 1. The ALJ's April 29, 2020 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C.  § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II.     The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the

Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his April 29, 2020 decision:

1. The claimant has not engaged in substantial gainful activity since December 6, 2017, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: systemic lupus erythematosus; fibromyalgia; and asthma (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b)[1] except the claimant can occasionally climb ramps, stairs, ladders, ropes, and scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. She can have no exposure to humidity and wetness, and no exposure to dust, odors, fumes, or pulmonary irritants. She can have no exposure to extreme cold or extreme heat. The claimant needs a sit/stand option, allowing her to change position every 30 minutes.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on August 14, 1982 and was 35 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 6, 2017, the date the application was filed (20 CFR 416.920(g)).

Tr. 17-30.

Accordingly, the ALJ determined that, based on the application for supplemental security benefits protectively filed on December 6, 2017, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act. Tr. 31.

## <u>ANALYSIS</u>

Plaintiff asserts two points of error, both of which challenge the ALJ's RFC findings because they were not based on a matching medical opinion. Plaintiff first argues that the RFC finding for a range of light work with a sit/stand option was too specific. *See* ECF No. 8-1 at 9-13. Plaintiff next argues that the RFC was not supported by substantial evidence because the ALJ relied on no opinion evidence. *See id*. at 13-18. According to Plaintiff, the ALJ "rejected the only opinions that included any functional limitations and instead relied on his own lay interpretation of the raw medical record to craft an RFC." *Id*. at 13.

The Commissioner argues in response that substantial evidence supports the ALJ's finding that Plaintiff's conditions would still permit her to perform a range of light work with a sit/stand option. *See* ECF No. 9-1 at 13-23. The Commissioner further argues that no medical opinion specifically supported totally disabling functional restrictions, and Plaintiff's arguments do not meaningfully dispute any of the ALJ's reasoning or the evidence relied upon by the ALJ; rather, argues the Commissioner, Plaintiff failed to meet her burden to prove greater restrictions than already accounted for by the ALJ. *See id*.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review of the record in this case, the Court finds that the ALJ sufficiently supported the RFC finding with substantial evidence, including the opinion evidence, Plaintiff's treatment records, and her statements about her symptoms and daily activities. The ALJ properly relied on multiple evidentiary sources to arrive at the RFC finding and was not required to base the RFC directly on any one medical opinion, as Plaintiff argues. Because substantial evidence supports the ALJ's decision, the Court finds no error.

Plaintiff alleged that she was unable to work due to a variety of conditions, including lupus, fibromyalgia, and pain in the neck, shoulders, and joints. Tr. 94, 223. She had diagnoses of lupus and fibromyalgia, dating to November 2008 and January 2016, respectively. Tr. 345. In January 2016, Plaintiff described her employment as a "full time stay at home mom." Tr. 346. She reported a moderate activity level, being a health club member, and exercising daily for a weekly total of five to ten hours. *Id*. 346. A physical examination showed normal neurological, neck, and extremity findings. Tr. 348.

On October 12, 2016, Plaintiff followed up at Lifetime Health Medical Group ("Lifetime") for a preventive exam and depression. Tr. 308-15. In addition to lupus, for which Plaintiff was being followed by a rheumatologist, other ailments, including constipation, bowel disease, gastroesophageal reflux disease ("GERD"), dysuria, and major depressive disorder were also

noted. Tr. 308-09. She reported that she belonged to a health club and exercised five to ten hours per week. Tr. 311. Other symptoms reported included back pain, abdominal pain, sleep difficulty, poor concentration, loss of interest, and restlessness. Tr. 312. Plaintiff's current medications included Cymbalta, Miralax, gabapentin, Plaquenil, Pantoprazole, and Senna. Tr. 314. Plaintiff reported taking all medications as prescribed, except Senna, which she was "consistently taking differently than prescribed." *Id*.

On November 18, 2016, Plaintiff had a follow-up visit with gynecologist Magda Osman, M.D. ("Dr. Osman"), complaining of pain before menses, particularly on the left side, which improved during her period. Tr. 404. She also complained of occasional dizziness (Tr. 404) and burning with urination (Tr. 405). Plaintiff was using a copper IUD (intrauterine device) for contraception and reported using a Mirena IUD in the past, which caused spotting. Tr. 404. Dr. Osman noted no abnormal findings on physical and pelvic examination. Tr. 405.

On October 25, 2017, Plaintiff established primary care at Highgate Medical Group ("Highgate") with physician assistant Renee Sawka, RPA-C ("Ms. Sawka"). Tr. 392-94. Plaintiff reported having lupus and fibromyalgia, which were both stable on Plaquenil and Cymbalta and had no complaints. Tr. 392. Plaintiff described her occupation as "Currently Working – stay at home mom." Tr. 392. She exercised regularly. Tr. 393. A physical examination showed unremarkable findings. *Id*.

At a follow-up visit with Dr. Osman on November 21, 2017, Plaintiff reported left pelvic pain, cloudy urine, and burning. Tr. 606. She reported having "a lot of pain from her fibromyalgia" which was "making everything worse." *Id*. Plaintiff reported experiencing worsening pain for a few months. *Id*. Plaintiff indicated she was "okay with removing the IUD since it can be causing or making the pain worse." *Id*. Dr. Osman removed Plaintiff's IUD and prescribed oral

7

contraceptives. Tr. 609-10. Dr. Osman also prescribed an antibiotic after a genital culture returned positive for bacteria. Tr. 610.

On November 26, 2017, Plaintiff had a follow-up visit with nurse practitioner Kathleen Cloutier ANP-BC ("Ms. Cloutier"), at WNY Rheumatology Center ("WNY Rheumatology"), regarding "a long-standing history of joint pain." Tr. 533. Plaintiff had a history of lupus and fibromyalgia and reported having a flare-up of symptoms with overwhelming fatigue, brain fog, difficulty concentrating, memory issues, and diffuse arthralgias, myalgias, and tenderness to touch. *Id*. Plaintiff reported she had been exercising regularly, but because she was having some knee pain, she had "given up on her spinning classes." *Id*. She was taking Cymbalta daily, which helped, as well as hydroxychloroquine, gabapentin as needed, and vitamin supplements. *Id*. Ms. Cloutier advised Plaintiff to take gabapentin regularly, as it may work better if taken on a consistent schedule. *Id*. Ms. Cloutier noted that Plaintiff's lupus did not appear to be active, and the flareup was related to fibromyalgia symptoms. *Id*. She encouraged Plaintiff to continue vitamin supplements and regular exercise and administered an intramuscular injection of Toradol and Solu-Medrol "to help with her flareup of symptoms." Tr. 534.

On January 13, 2018, Plaintiff attended a consultative examination with Nikita Dave, M.D. ("Dr. Dave"). Tr. 435-39. Plaintiff was 35 years old at that time and reported being diagnosed with lupus at age 19, which had been primarily asymptomatic. Tr. 435. She reported having occasional flares, during which times she felt depressed; was unable to get out of bed; developed orals sores; and had "overwhelming fatigue." *Id*. She reported her last episode was two months ago. *Id*.

Plaintiff also reported fibromyalgia diagnosed six years ago, with varying diffuse symptoms, more bad days than good days; pain especially in the cervical area radiating to the head and causing pressure behind the eyes; difficulties sitting or standing more than 20 minutes on a

bad day; intermittent pain and numbness in the right fingers; and pain "all over" on and off. Tr. 435. She reported working out twice a week, which had been very helpful. *Id*. She also reported a history of anemia since birth, which was aggravated by weather changes and upper respiratory infections; and she was susceptible to bronchitis and used an inhaler daily. *Id*. She cooked, cleaned, did laundry, shopped weekly, and performed childcare daily. Tr. 436. For depression she was taking Cymbalta, which had been very helpful. *Id*.

On examination, Plaintiff squatted to 3/4 of full. Tr. 437. She otherwise appeared to be in no acute distress, had a normal gait, walked on her heels and toes without difficulty, needed no help changing or getting on and off the examination table, and was able to rise from a chair without difficulty. *Id*. Other than cervical extension to 10 degrees, a musculoskeletal examination showed unremarkable findings. *Id*. Neurologically, Plaintiff had physiologic and equal reflexes, no sensory deficits, and full strength. Tr. 438. She had intact hand and finger dexterity, and full grip strength. *Id*. Dr. Dave assessed that Plaintiff may need to avoid smoke, dust, fumes, inhalants, chemicals, extremes of temperature, and humidity due to asthma but assessed no other limitations based on the physical evaluation. *Id*. However, Dr. Dave indicated, that "based on [Plaintiff's] historical evaluation, during acute severe flares of lupus, she may have moderate limitations for all strenuous physical activity, transiently for a few days." Tr. 438.

On January 30, 2018, Plaintiff had a follow-up visit with Ms. Cloutier at WNY Rheumatology. Tr. 535-36. Plaintiff reported that the injections administered at her last visit made her feel significantly worse, very fatigued and "sick," but she noted her symptoms started to improve about a week later. Tr. 535. She reported that her symptoms were now the same. *Id*. She reported some pain in the left shoulder with certain movements but denied joint swelling or warmth. *Id*. She was trying to exercise three times a week. *Id*. Ms. Cloutier noted that Plaintiff's

complaints of diffuse arthralgias, myalgias, fatigue, etc. were "common complaints" attributable to fibromyalgia, and her symptoms were at this point "manageable." Tr. 536. Ms. Cloutier recommended continuing medications and encouraged Plaintiff to focus on a healthy lifestyle including daily exercise. *Id*.

On February 5, 2018, state agency medical consultant C. Krist, D.O. ("Dr. Krist"), assessed that Plaintiff was capable of performing functions commensurate with medium work except she needed to avoid concentrated exposure to respiratory irritants such as extreme cold or heat, humidity, and fumes, odors, dusts, gasses, and poor ventilation. Tr. 89-92.

Plaintiff returned to Dr. Osman on February 14, 2018, reporting she was feeling much better after removal of her copper IUD; her periods were "light and not painful;" and she wanted to try a different type of IUD. Tr. 611. There were no symptoms of vaginal infections, and a review of systems was negative for vaginal discharge/abnormal bleeding, pelvic pain, abdominal pain, or breast pain, as well as negative for nausea, vomiting, diarrhea, or constipation. *Id*.

On March 31, 2018, Plaintiff presented to MASH Urgent Care, complaining of a dry cough that had persisted for four days. Tr. 470.  Plaintiff was shaking but had no fevers, shortness of breath, or sore throat. *Id*. A review of systems was negative for fatigue or weakness, and physical examination was normal except for frequent coughing. Tr. 470-71. Plaintiff's coughing stopped after a nebulizer treatment, and she was diagnosed with upper respiratory disease. Tr. 471.

On June 11, 2018, Plaintiff saw Sunita Chadha, M.D. ("Dr. Chadha"), at WNY Rheumatology. Tr. 537-39. Plaintiff continued to report the same symptoms. Tr. 537. She also noted difficulty with memory, reporting she got lost on her way to the office, and she complained of shoulder pain with some movements. *Id*. She was taking her medications and was trying to exercise three times per week. Tr. 537. Dr. Chadha again noted that Plaintiff's reported symptoms

were attributable to fibromyalgia. Tr. 539. She further noted that Plaintiff's memory lapses and brain fog could also be attributed to fibromyalgia. Tr. 539. Dr. Chadha told Plaintiff she was "maxed out as far as drug therapy [is] concerned" and advised Plaintiff to consider seeing a neuropsychologist. Tr. 539.She also advised Plaintiff to see a gastroenterologist or her primary care physician if "Senna [was] not enough to regulate her bowel habits;" and discussed lifestyle modifications such as daily exercise. *Id*.

Plaintiff returned to Ms. Sawka at Highgate on September 5, 2018, complaining of sore throat symptoms that started four days earlier and now were progressing to myalgia and fatigue. Tr. 473. An examination showed normal neck, musculoskeletal, and neurological findings. Tr. 474-75. Ms. Sawka indicated that Plaintiff's symptoms were likely viral; noted that lupus and fibromyalgia were stable on medications; and discussed routine health maintenance including continuing an exercise regimen. Tr. 475-76.

Plaintiff had a rheumatology follow-up visit with Ms. Cloutier on December 9, 2018. Tr. 541. Ms. Cloutier noted that Plaintiff was last seen six months ago. Tr. 541. Plaintiff continued to report the same symptoms, as well as new symptoms of numbness, tingling in her fingertips, and "pins and needles pain" in her shoulders. *Id*. She also reported feeling exhausted. *Id*. She felt that gabapentin helped her pain but worsened her fatigue and made her groggy in the morning; and she wanted to try Lyrica. *Id*. She stated she was trying do stretches and walk three times a day. *Id*. Her insurance would not pay for aquatic or massage therapy, so she had not tried it; she also went to yoga, but an instructor commented on her loud cracking joints, so she did not go back. Tr. 541-42. Ms. Cloutier prescribed Lyrica, noting that although Plaintiff's insurance had previously denied it, she believed it should be approved because her gabapentin dosage could not be increased. Tr. 542. Ms. Cloutier noted that Plaintiff's symptomatology was not consistent with active lupus, which

appeared to be well-controlled. *Id*. She again encouraged Plaintiff to exercise daily. *Id*. Plaintiff's insurance approved Lyrica on December 18. Tr. 468.

On January 30, 2019, Plaintiff underwent an orthopedic evaluation by James Kelly, D.O. ("Dr. Kelly"), at Excelsior Orthopaedics, LLP ("Excelsior"). Tr. 482-85. She reported right hand pain and numbness in her arm, shoulder and fingertips. Tr. 482. She had taken gabapentin without benefit and was recently started on Lyrica. Tr. 482. On examination, she reported exacerbation of generalized arm dysesthesias after performing Tinel's. Tr. 484. Examination was otherwise normal. Tr. 484. Dr. Kelly suspected cervical radiculopathy and peripheral neuropathy of median ulnar and radial nerves. Tr. 485. Dr. Kelly recommended an electromyography ("EMG") (Tr. 485), which was performed on February 5, 2019 (Tr. 487). The EMG showed no evidence of cervical radiculopathy or entrapment neuropathy but suggested mild distal axonal loss neuropathy, for which glucose tolerance testing to screen for postprandial hyperglycemia was recommended. Tr. 487.

Plaintiff followed up at Excelsior on February 26, 2019, reporting continued numbness and tingling, with similar symptoms in her feet. Tr. 563. Plaintiff was advised to follow-up with her primary care provider and with her rheumatology provider for a possible adjustment of the Lyrica prescription. Tr. 565.

On March 13, 2019, Plaintiff had a follow-up visit with Michael Freitas, M.D. ("Dr. Freitas"), at Highgate, complaining of fatigue and feeling like she had the flu all day. Tr. 497-99. Plaintiff felt like her fibromyalgia medications were not helping and was concerned about side effects. Tr. 497. In a review of systems, Plaintiff denied musculoskeletal or neurological symptoms. Tr. 497. Dr. Freitas noted that Plaintiff was told to undergo neuropsychological testing, but never went. Tr. 497. Dr. Freitas assessed that Plaintiff's symptoms had a likely

neuropsychological component, and again referred Plaintiff for neuropsychological testing. Tr. 499.

During a rheumatology visit with Ms. Cloutier on March 18, 2019, Plaintiff reported that she had more symptoms since starting Lyrica. Tr. 500. She reported that her overall pain was reduced, but she felt "overwhelming fatigue, headaches, and [had] trouble concentrating." *Id*. Ms. Cloutier noted that although Plaintiff questioned whether this was caused by Lyrica, Plaintiff was reluctant to reduce or stop Lyrica because it helped with her overall pain. *Id*. Ms. Cloutier advised Plaintiff to continue Lyrica in the hope that the symptoms would improve over time. Tr. 501. Plaintiff indicated that she had an upcoming trip out of the country to visit her father for about a month and asked what she should do about her medication during that time. Tr. 500. Ms. Cloutier suggested stopping Lyrica while Plaintiff was out of the country and restarting a reduced dose when she returned. Tr. 501. Ms. Cloutier noted that Plaintiff had been "reporting all these symptoms for many years . . . ," and "[they] are all fibromyalgia symptoms, but we will figure [it] out [o]nce her medicine is on hold." *Id*.

On August 27, 2019, Plaintiff returned to Excelsior for follow-up regarding "her suspected cervical radiculopathy and peripheral neuropathy of median ulnar and radial nerves." Tr. 575. Plaintiff also presented with a new complaint of right wrist pain lasting two months and pain when attempting to fully extend her fingers on both sides, worse on the right; she reported clumsiness and dropping objects due to hand weakness. *Id*. Dr. Kelly noted that Plaintiff was previously advised to undergo glucose tolerance testing, but Plaintiff's primary care provider advised that it was not warranted. Tr. 577. Plaintiff declined to consider a cortisone injection, and Dr. Kelly instructed Plaintiff to use a right upper extremity orthosis for stabilization and to improve function.

Tr. 577-78. On that same date, Dr. Kelly informed Dr. Freitas that Plaintiff no longer needed close monitoring unless her orthopedic symptoms increased or persisted. Tr. 586.

In an annual gynecological visit with Dr. Osman on July 3, 2019, Plaintiff had no complaints. Tr. 617. A review of systems was negative for neurological or musculoskeletal symptoms, including weakness or joint pain. Tr. 619.

During a rheumatology follow-up visit on July 8, 2019, Plaintiff reported to Dr. Chadha that she was not sure how much Lyrica was helping, and she did not want to increase the dose because it made her feel drowsy. Tr. 545. She also reported improvement in the "shocklike sensations" she had been having, but she still had pain and fatigue, as well as "a lot of memory problems." *Id*. Dr. Chadha noted that Plaintiff "complain[ed] mostly about joint aches, fatigue, listlessness, mood disorders, and brain fog" and noted that recent laboratory studies revealed no specific abnormalities or were otherwise unremarkable. *Id*. Dr. Chadha observed that many of Plaintiff's symptoms were suggestive of fibromyalgia syndrome, and stated "[w]e have done all we can to [] manage this condition." *Id*. She suggested that Plaintiff "can see a neurologist if she wishes to for her memory problems." *Id*. Dr. Chadra also noted that there was not any conclusive evidence that any of Plaintiff's symptoms were due to lupus, and Plaintiff did not want to use steroids that usually helped for lupus symptoms. Tr. 546. She suggested methotrexate for musculoskeletal symptoms and gave Plaintiff some literature to review. Tr. 546.Plaintiff indicated that she would "give it some thought." *Id*.

On October 18, 2019, Plaintiff had a follow-up rheumatology visit with Kaitlyn Putzbach, FNP ("Ms. Putzbach"), at WNY Rheumatology. Tr. 592. She reported that her symptoms were ongoing and stable on Lyrica and described her symptoms as "somewhat manageable. Tr. 592. She also reported that Lyrica did not make her feel as drowsy as it used to, but she did not want to

increase it. *Id*. Plaintiff reported she was trying to stay active, and if able, she would work out a few times a week. *Id*. She had not attended chiropractic or massage therapy due to cost issues, though she thought it would help, and she had not tried any topical applications of heat, cold, or rubs. *Id*. Plaintiff had not had any recent lab work, and she told Ms. Putzbach she lost the lab slip from her last visit. *Id*. Ms. Putzbach noted that Plaintiff's symptoms were "suggestive of fibromyalgia syndrome," and "we have done all we can to manage this condition." Tr. 593. She suggested that Plaintiff try topical treatments and natural anti-inflammatory supplements and encouraged her to stay active and continuing with regular exercise. *Id*. Due to potential side effects, Plaintiff declined to try methotrexate, which had been suggested at her previous visit. *Id*.

On January 16, 2020, Ms. Putzbach submitted a check-box medical source statement form. Tr. 602-04. Ms. Putzbach indicated that Plaintiff had history of joint pain and joint tenderness, and morning stiffness, as well as muscle pain/tenderness, fatigue, and paresthesia. Tr. 602. She also indicated that Plaintiff had symptom flareups that would preclude any work activity. Tr. 604. However, Ms. Putzbach also indicated that their office did not perform functional assessments (Tr. 603), and she could not answer how many days Plaintiff would be absent from work (Tr. 604).,

As noted above, Plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence because the RFC finding for a range of light work with a sit/stand option was too specific, and the ALJ did not base the RFC finding directly on any one medical opinion. *See* ECF No. 8-1 at 9-18. A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); Social Security Ruling ("SSR") 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20

C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. Oct. 15, 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec. 1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588. Indeed, an ALJ may formulate an RFC absent any medical opinions. "Where, [] the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations and quotation omitted).

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole);

*Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Furthermore, the burden to provide evidence to establish the RFC lies with Plaintiff—not the Commissioner. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the sequential inquiry . . . ."); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4 (W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC."); *Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (The burden is on Plaintiff to show that she cannot perform the RFC as found by the ALJ.).

Effective for claims filed on or after March 27, 2017, the Social Security Agency comprehensively revised its regulations governing medical opinion evidence creating a new regulatory framework. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15, 132-01 (March 27, 2017). Plaintiff filed her application on December 6, 2017, and therefore, the 2017 regulations are applicable to her claim.

First, the new regulations change how ALJs consider medical opinions and prior administrative findings.  The new regulations no longer use the term "treating source" and no longer make medical opinions from treating sources eligible for controlling weight. Rather, the new regulations instruct that, for claims filed on or after March 27, 2017, an ALJ cannot "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 416.920c(a) (2017).

Second, instead of assigning weight to medical opinions, as was required under the prior regulations, under the new rubric, the ALJ considers the persuasiveness of a medical opinion (or a prior administrative medical finding). *Id.* The source of the opinion is not the most important factor in evaluating its persuasive value. 20 C.F.R. § 416.920c(b)(2). Rather, the most important factors are supportability and consistency.  *Id.*

Third, not only do the new regulations alter the definition of a medical opinion and the way medical opinions are considered, but they also alter the way the ALJ discusses them in the text of the decision. 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he or she considered each factor. *Id.* Instead, when articulating his or her finding about whether an opinion is persuasive, the ALJ need only explain how he or she considered the "most important factors" of supportability and consistency. *Id.* Further, where a medical source provides multiple medical opinions, the ALJ need not address every medical opinion from the same source; rather, the ALJ need only provide a "single analysis." *Id.*

Fourth, the regulations governing claims filed on or after March 27, 2017 deem decisions by other governmental agencies and nongovernmental entities, disability examiner findings, and statements on issues reserved to the Commissioner (such as statements that a claimant is or is not disabled) as evidence that "is inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled." 20 C.F.R. § 416.920b(c)(1)-(3) (2017). The regulations also make clear that, for claims filed on or after March 27, 2017, "we will not provide any analysis about how we considered such evidence in our determination or decision" 20 C.F.R. § 416.920b(c).

Finally, Congress granted the Commissioner exceptionally broad rulemaking authority under the Act to promulgate rules and regulations "necessary or appropriate to carry out" the relevant statutory provisions and "to regulate and provide for the nature and extent of the proofs

and evidence" required to establish the right to benefits under the Act. 42 U.S.C. § 405(a); *see also* 42 U.S.C. § 1383(d)(1) (making the provisions of 42 U.S.C. § 405(a) applicable to title XVI); 42 U.S.C. § 902(a)(5) ("The Commissioner may prescribe such rules and regulations as the Commissioner determines necessary or appropriate to carry out the functions of the Administration."); *Barnhart v. Walton*, 535 U.S. 212. 217-25 (2002) (deferring to the Commissioner's "considerable authority" to interpret the Act); *Heckler v. Campbell*, 461 U.S. 458, 466 (1983). Judicial review of regulations promulgated pursuant to 42 U.S.C. § 405(a) is narrow and limited to determining whether they are arbitrary, capricious, or in excess of the Commissioner's authority. *Brown v. Yuckert*, 482 U.S. 137, 145 (1987) (citing *Heckler v. Campbell*, 461 U.S. at 466).

Although Plaintiff separates her challenges to the ALJ's RFC finding into two arguments, her arguments are substantively identical. *See* ECF No. 8-1 at 9-17. Plaintiff does not meaningfully dispute any of the ALJ's reasoning or the evidence relied on by the ALJ; rather, Plaintiff maintains that an RFC finding for a range of light work with a sit/stand option was too specific in relation to the opinion evidence. *See id*. at 9-17. Contrary to Plaintiff's contentions, however, the ALJ relied on multiple evidentiary sources to make an RFC finding that accounted for all of Plaintiff's credible limitations, as supported by the record. Tr. 24-29.  *See* 20 C.F.R. §§ 404.1527, 416.927.

As the ALJ considered, while Plaintiff alleged some extreme symptoms and functional restrictions in connection with her disability claim, the extent of these allegations was not consistent with the record evidence. Tr. 25, 29. The ALJ also considered that there was no objective medical evidence corroborating significant functional restrictions. Tr. 25-27, 393, 438, 474-75, 499, 542, 545-46, 565, 577-78. As the ALJ noted, the evidence indicated that Plaintiff's symptoms were managed with medications, and there were several occasions when she declined other

medications or treatment modalities. Tr. 26-29, 475-76, 497, 501, 536, 539, 546, 593. Plaintiff also repeatedly reported exercising regularly (Tr. 393, 435, 535, 537, 541-42, 592,) which her medical providers encouraged, some even encouraging daily exercise (Tr. 475, 534, 536, 539, 542, 593, 609). Tr. 25-26.

In terms of opinion evidence, the ALJ considered Ms. Putzbach's January 2020 medical assessment form opining that Plaintiff could not perform any work activity during flares-ups and had been so limited since at least December 2017. Tr. 28-29, 603-04. The ALJ reasonably found Ms. Putzbach's opinion "unpersuasive" for multiple reasons. Tr. 29. First, the ALJ noted that Ms. Putzbach rendered her opinion using a check-box form; she did not complete most of the form; and she indicated on the form that her office does not perform functional assessments. Tr. 29, 603-04. As this Court has noted previously, such check-box forms are of limited evidentiary value. *See, e.g., Koerber v. Comm'r of Soc. Sec.*, No. 6:19-CV-1070-DB, 2020 WL 1915294, at *1 (W.D.N.Y. Apr. 20, 2020); *Halloran v. Barnhart*, 362 F.3d 28, 31 n.2 (2d Cir. 2004) ("[t]he standardized form . . . is only marginally useful for purposes of creating a meaningful and reviewable factual record"); *see also Schillo v. Kijakazi*, 31 F.4th 64, 72, 77 (2d Cir. 2022) (an ALJ may reasonably grant little weight to treating source opinions rendered in "check box" fashion, with almost no explanation)..

The ALJ also noted that Ms. Putzbach did not identify or quantify how often Plaintiff would have flare-ups to the point she could not perform any work activity; and she wrote "unable to answer" when asked how often Plaintiff was likely to be absent from work as a result of her impairment and treatment. Tr. 29, 604. As the ALJ further noted, Ms. Putzbach's opinion that Plaintiff had flare-ups to the point that she could not perform any work activity were not supported by or consistent with the medical evidence in her own treatment records, or records from other sources. Tr. 29. The ALJ noted that Plaintiff was consistently encouraged to stay active; her

condition was largely stable with hydroxychloroquine, Cymbalta and gabapentin and/or Lyrica; and there was no documentation of any significant abnormal examination findings. For example, Ms. Cloutier assessed Plaintiff's symptoms as manageable and attributable to fibromyalgia, and she repeatedly encouraged Plaintiff to focus on a healthy lifestyle including daily exercise. Tr. 26, 475, 534, 536, 539, 542, 593, 609. Furthermore, Plaintiff's lupus was assessed as well-controlled, with no symptomatology consistent with active lupus. Tr. 26, 542.

The ALJ also noted that despite Plaintiff's continued complaints of pain, fatigue, drowsiness, and brain fog, there were no examination findings showing clinical evidence of weakness, discomfort, lethargy, distractibility, memory loss, or inability to sit, stand, or walk, and examinations from other providers similarly did not reflect significant abnormal physical examination signs and findings. Tr. 26, 437-38, 535. In addition, noted the ALJ, Plaintiff did not report monthly flare-ups or being bedridden during flare-ups to her rheumatology providers. Tr. 26. Moreover, Ms. Putzbach's conclusions regarding Plaintiff's inability to work are not medical opinions, but, rather, statements on an issue reserved to the Commissioner, which the regulations explicitly provide are inherently neither valuable nor persuasive. *See* 20 C.F.R. §§ 416.913(a)(2), 416.920b(c)(3).

In any event, as the ALJ considered, there was no evidence that Plaintiff had any symptom flares attributable to lupus in the relevant period. Tr. 26-29, 475-76, 534, 542, 546. Nor did the record evidence show that Plaintiff's symptom flare-ups attributable to fibromyalgia would be so limiting as to preclude a range of light work with a sit/stand option over a period of at least 12 months. Tr. 26-29. *See* 20 C.F.R. § 416.909 ("Unless your impairment is expected to result in death, it must have lasted or be expected to last for a continuous period of at least 12 months."); *Barnhart v. Walton*, 535 U.S. 212, 219 (2002) ("No one claims that the statute would permit an

individual with a chronic illness—say, high blood pressure—to qualify for benefits if that illness, while itself lasting for a year, were to permit a claimant to return to work after only a week, or perhaps even a day, away from the job.").

The ALJ also considered the opinion of consultative examiner Dr. Dave, finding it "partially persuasive." Tr. 28, 435-39. As the ALJ explained, Dr. Dave's opinion that Plaintiff should avoid pulmonary irritants and extremes of temperature was supported by and consistent with his examination findings and the evidence in the record regarding Plaintiff's history of asthma, but Dr. Dave's opinion that, Plaintiff had no other limitations based on physical examination was not fully supported by or consistent with Plaintiff's lupus and fibromyalgia diagnoses, which the ALJ determined, warranted a limitation to light exertion with postural restrictions to account for her pain.. Tr. 28, 438.

As for Dr. Dave's opinion that Plaintiff may have a few days of moderate limitations for all strenuous physical activity during acute severe flare-ups of lupus, the ALJ found this unpersuasive, as it appeared to be based on Plaintiff's reports, as well as inconsistent with treatment records from WNY Rheumatology and other sources, which did not reflect any lupus flares during the relevant period. Tr. 26-29, 475-76, 534, 542, 546. *See, e.g.*, *Polynice v. Colvin*, 576 F. App'x 28, 31 (2d Cir. 2014) ("Much of what Polynice labels 'medical opinion' was no more than a doctor's recording of Polynice's own reports of pain."). The ALJ also reasonably concluded that the evidence regarding Plaintiff's fibromyalgia flares did not support a finding that she could not perform light work with a sit/stand option on a sustained basis. Tr. 28.

Furthermore, Dr. Dave's opinion of moderate limitations for all strenuous physical activity during acute severe flares of lupus was not totally disabling. Tr. 28, 438. *See Snyder v. Saul*, 840 F. App'x 641, 643 (2d Cir. 2021) (concluding that opinions assessing only moderate limitations

supported an RFC finding for light work); *Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 109 (2d Cir. 2020) (concluding that the ALJ's RFC finding was sufficiently supported by a consultative examiner's opinion assessing only some moderate limitations); *White v. Berryhill*, 753 F. App'x 80, 82 (2d Cir. 2019) (rejecting an argument that moderate limitations precluded an RFC finding for light work).

The ALJ also considered the February 2018 opinion of state agency medical consultant Dr. Krist (Tr. 89-92) and found it "unpersuasive" for similar reasons. Tr. 28. Dr. Krist assessed that Plaintiff was capable of medium work, but the ALJ found this was not supported by or consistent with Plaintiff's treatment records and did not sufficiently account for her pain. Tr. 28, 89-92.

Having considered the opinions of Dr. Dave and Dr. Krist, the ALJ weighed the evidence significantly more favorably to Plaintiff's allegations, and reasonably found that an RFC for a range of light work with a sit/stand option accounted for any credibly established functional restrictions. Tr. 24-29. "[R]emand is generally not warranted where the ALJ's RFC finding is more restrictive than the limitations set forth in the medical opinions of record." *Baker v. Berryhill*, 2018 WL 1173782, at *4 (W.D.N.Y. 2018); *see Lesanti v. Comm'r of Soc. Sec.*, No 1:19-cv-00121 (EAW), 436 F.Supp.3d 639, 646 ((W.D.N.Y. 2020) ("[t]he fact that the ALJ afforded [p]laintiff the benefit of the doubt and included a 5% off-task time limitation in the RFC assessment is not grounds for remand"); *Beaman v. Comm'r of Soc. Sec.*, 2020 WL 473618, *5 (W.D.N.Y. 2020) ("[p]laintiff's argument that the ALJ based her highly specific RFC based upon her own lay opinion necessarily fails[;] [i]t is clear that the ALJ fashioned her RFC finding by referring to [the consultative examiner's opinion] and incorporating additional restrictions based on [p]laintiff's own testimony"); *Wilson v. Colvin*, No. 6:16-cv-06509-MAT, 2017 WL 2821560, at *5 (W.D.N.Y.

June 30, 2017) ("Furthermore, the fact that an RFC assessment does not correspond exactly to a medical expert's opinion in the record does not mean that the RFC assessment is 'just made up'").

Plaintiff's own statements also lend additional support to the ALJ's RFC finding. As the ALJ noted, Plaintiff testified that when not in a flare, she could stand for 15-20 minutes, walk for 20-30 minutes, and sit for 20-30 minutes. Tr. 25, 60-65. Thus, Dr. Dave and Dr. Krist's assessments, as well as Plaintiff's testimony, support the ALJ's finding for a range of light work with a sit/stand option permitting her to change position every 30 minutes. *See Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (holding that, under the substantial evidence standard, the ALJ's decision is sufficient as long as a reviewing court can "fathom the ALJ's rationale in relation to evidence in the record . . . ."). Thus, Plaintiff's argument that the ALJ's "highly specific" RFC was not supported by substantial evidence is meritless.

Moreover, as explained above, RFC is an administrative finding, not a medical one. Ultimately, an ALJ, not a medical source, assesses RFC based on the record at large. 20 C.F.R. § 404.1545(a). *See Tricarico v. Colvin*, 681 F. App'x 98, 101 (2d Cir. 2017) (citing *Matta*, 508 F. App'x at 56) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."). Thus, opinion evidence is only one type of evidence that an ALJ is required to consider. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e) ("we will assess the residual functional capacity based on all the relevant medical and other evidence in your case record"); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) (explaining that the adjudicator will assess the RFC based on all the relevant evidence in the case record); 20 C.F.R. §§ 404.1513(a)(1),(4), 416.913(a)(1),(4) (explaining that evidence that can be considered includes objective medical evidence, such as medical signs and laboratory findings; as

well as evidence from nonmedical sources, including the claimant, such as from forms contained in the administrative record).

Here, the ALJ noted that Plaintiff's statements were not fully consistent with the objective medical evidence. Tr. 29. For example, Plaintiff testified that during a flare she could not even carry her cell phone and could not do anything except lie in bed all day. Tr. 64-65. However, the ALJ noted that Plaintiff was seen at WNY Rheumatology during a flare, but the treatment note does not reflect evidence that she presented in this degree of distress or incapacity. Tr. 29, 533. Plaintiff also testified that she was unable focus due to brain fog, but there were no examination findings that show Plaintiff to be inattentive, distracted, or with cognitive abnormalities. Tr. 29.

Next, the ALJ noted that Plaintiff's statements were not entirely consistent with her reported activities. Tr. 29. *See* 20 C.F.R. § 404.1529(c)(3)(i) (An ALJ may consider the nature of a claimant's daily activities in evaluating the consistency of allegations of disability with the record as a whole.); *see also Ewing v. Comm'r of Soc. Sec.*, No. 17-CV-68S, 2018 WL 6060484, at *5 (W.D.N.Y. Nov. 20, 2018) ("Indeed, the Commissioner's regulations expressly identify 'daily activities' as a factor the ALJ should consider in evaluating the intensity and persistence of a claimant's symptoms.") (citing 20 C.F.R. § 416.929(c)(3)(i)). For example, at the 2018 consultative examination with Dr. Dave, Plaintiff reported that Plaintiff cooks, cleans, does laundry, and shops once a week, and she does childcare daily. Tr. 29, 436. *Poupore*, 566 F.3d at 307 (claimant's abilities to watch television, read, drive, and do household chores supported ALJ's finding that his testimony was not fully credible). Furthermore, as noted previously, treatment records from WNY Rheumatology and other providers indicated that Plaintiff tried to stay active by working out a few times a week (Tr, 393, 535, 536, 537, 592), and she reported traveling out

of the country for about a month, during which time she wanted to stop taking Lyrica (Tr. 543-44). Tr. 29.

Finally, the ALJ noted that Plaintiff's degree of medical treatment was not fully consistent with her statements. Tr, 29. For example, Plaintiff had been referred for neuropsychological evaluation by two providers, Highgate and WNY Rheumatology, but there was no evidence that she followed up. Tr, 29, 494, 499, 539. The ALJ also noted that Plaintiff had been offered additional medication, such as methotrexate and steroids, but declined. Tr. 29, 546, 592.

Based on the foregoing, the ALJ properly analyzed the entire record in accordance with the Commissioner's regulations and properly assessed Plaintiff's RFC. *See* 20 C.F.R. § 416.946(c) (the responsibility for determining a claimant's RFC rests solely with the ALJ); *see also Richardson*, 402 U.S. at 399 (it is within the sole province of the ALJ to weigh all evidence and resolve material conflicts); *see Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (it is the province of the ALJ to consider and resolve conflicts in the evidence as long as the decision rests upon "adequate findings supported by evidence having rational probative force").

As previously noted, Plaintiff bears the ultimate burden of proving that she was more limited than the ALJ found. *See Valentin v. Comm'r of Soc. Sec.*, 820 F. App'x 71, 713 (2d Cir. 2020) ("Valentin does not identify any evidence supporting a more limited RFC."); *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) ("Smith had a duty to prove a more restrictive RFC, and failed to do so."); *Poupore*, 566 F.3d at 306 (it remains at all times the claimant's burden to demonstrate functional limitations, and never the ALJ's burden to disprove them). While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which she has failed to do.

When "there is substantial evidence to support either position, the determination is one to be made by the fact-finder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)). The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in the original). As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

## <u>CONCLUSION</u>

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 8) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 9) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.


DON D. BUSH
UNITED STATES MAGISTRATE JUDGE